**COLUMBIA GAS TRANSMISSION CORP., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 88-4426.

United States Court of Appeals, Fifth Circuit.

May 1, 1990.

Richard A. Solomon, David D'Alessandro, Wilner & Scheiner, Washington, D.C., for Public Service Com'n of N.Y.

Joseph S. Davies, Timm L. Abendroth, Jerome Feit (argued), Sol., F.E.R.C., Washington, D.C., for respondents.

Richard L. Gottlieb (argued), Stephen J. Small, Charleston, W.Va., for petitioners.

Before CLARK, Chief Judge, BROWN and JOHNSON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The question is whether FERC properly required Columbia Gas Transportation Corporation (Columbia) to flow through to consumers payments made by its affiliate, Ozark Transmission (Ozark), to settle a § 16 enforcement action brought by the Commission against Ozark for violations of the Natural Gas Act (NGA). Intertwined are the related questions whether (i) the flow-through may be compelled as to periods during which Ozark's increased costs were not passed on to consumers; and (ii) whether regulatory flow-through would be in violation of several unrelated rate settlements.

### Ozark Violates NGA

Ozark [1] in 1978 filed an application for a certificate of public convenience and necessity under § 7(c), 15 U.S.C. § 717f(c), to construct and operate pipeline facilities to transport gas from Oklahoma to Arkansas. Tennessee and Columbia were each guaranteed 50% of the initial pipeline capacity. The Commission's approval was based on Ozark's estimate of total cost of approximately $119 million of which $3.8 million pertained to compression facilities. Actually, Ozark expended much more, largely on compression facilities. When Ozark filed its original tariff rates for service beginning March 1, 1982, the tariff projected a rate base of $130 million of which $19 million was for compression facilities.

In its June 1986 Show Cause Order, the Commission asserted that Ozark may have violated § 7(c) of NGA by constructing and operating more compression facilities than authorized by its certificate. They may also have violated § 4(a) by including the cost of such excess facilities in its rate base. 40 FERC ¶ 61,378, 82. Additionally, there were charges of environmental violations attributed to excess compression facilities and non-projected laterals.

### Ozark Settles Its Violations

In August 1987, the Commission approved an uncontested stipulation and consent agreement settling the enforcement proceeding. In the settlement Ozark agreed to settle "all allegations raised by the Commission *in this docket*" and, among other things, to pay approximately $4.5 million. 40 FERC ¶ 61,129. In approving the settlement the Commission expressly reserved the question of whether Ozark's two direct pipeline customers, Tennessee and Columbia, would be allowed to retain the funds or would be required to flow that sum through to their consumers. After hearings, the Commission held that the $4.5 million [2] should be flowed through to the consumers. The Commission in ordering the flow-through expressly found "this remedy to be just and reasonable and in the public interest because it is designed to preclude the Ozark partners [Columbia Gulf and Tennessee Ozark] from benefiting ... from the profits obtained from the unauthorized activities" of Ozark. *Ozark Gas Transmission System, Order on Severed Issue of Stipulation and Consent Agreement.* 42 FERC ¶¶ 61,198, 61,689 (1988).[3]

In the proceedings before the Commission on the question of flow-through, Columbia and Tennessee urged strenuously that the disposition of the funds should be

1. A partnership owned by four entities in equal shares, two of which were Columbia Gulf Transmission Company (Columbia Gulf), an affiliate of Columbia Gas, and Tennessee Ozark Company (Tennessee Ozark), an affiliate of Tennessee Gas Pipeline.

2. Actually, the Order required the immediate deposit by Ozark of $2,960,000, for the account of Columbia and Tennessee (to be split on a percentage basis) and to accumulate an additional $1.5 million in a separate account to be split 50% to Columbia and 50% to Tennessee.

   Technically, the Commission's Order of flow-through speaks in terms of 30 days. Consequently, the Order is deemed to be modified to require the flow-through of $1.5 million accumulated funds as, and when, received from Ozark.

3. Rehearing denied, 43 FERC ¶ 61,122 (1988).

determined by the terms in rate settlement agreements filed in their own rate proceedings before the Commission. That is, Columbia and Tennessee argued, there and here, that settlement of certain of the earlier rate cases precluded flow-through of the funds to consumers. Columbia's position was that rate settlements in those discrete proceedings governing its rates between 1982 and 1987 resolved all refund issues that might apply, including the disposition of the Ozark refunds resulting from the Commission's § 16 enforcement proceeding.

### Commission Orders Flow–Through

In rejecting these contentions, the Commission emphasized that the settlement agreed to by Ozark provided a remedy for the asserted violations of the NGA and the Commission's certificate. Exercising its remedial powers under § 16 of the NGA, 15 U.S.C. § 717o, the Commission concluded that flow-through to consumer customers represented the most equitable way to dispose of the sums received in settlement in words previously quoted, but again worth repeating:

> We find this remedy to be just and reasonable and in the public interest because it is designed to preclude the Ozark partners from benefitting, at the expense of the customers, from profits obtained from unauthorized activities.

42 FERC at ¶ 61, 689.

Rejecting specifically Columbia's contention that the respective rate settlements in their rate proceedings prohibited flow-through of these sums to consumer customers, the Commission emphasized that the settlements arose in the context of discrete rate proceedings and thus, were in no way applicable to the enforcement proceeding.

### March 1, 1982 to December 1982 Ozark Excess Charges Not Passed Through to Consumers

Independent of the rate settlement contention, Columbia urges as a sort of side issue the question of flow-through for the limited period March 1, 1982 to December 1982. Although no explanation appears for the fact,[4] it is uncontradicted that for this limited period Columbia did not pass through to its consumer customers the added excess Ozark charges. Since Columbia's consumer customers did not bear any of the excess Ozark charges for this period, Columbia contends that there is no legal or equitable basis for giving its consumer customers a financial windfall by passing through the charges Columbia absorbed and its customers never paid.

The Commission asserts that this court rejected the same argument in *Texas Eastern Transmission Corp. v. Federal Power Commission*, 414 F.2d 344 (5th Cir.1969), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 89 (1970). Although *Texas Eastern* presents a deceptively similar scenario, the case is distinguishable. Texas Eastern was the owner of a natural gas pipeline. During 1961–64 the rate that Texas Eastern's producers charged Texas Eastern for natural gas was higher than the rate approved by the Commission. Texas Eastern did not pass these rate increases to its customer-consumers; instead, the increases were absorbed by Texas Eastern. When the Commission disallowed the rate increases, the producers were ordered to refund the overcharge to Texas Eastern. The Commission then ordered Texas Eastern to refund the overcharge to its customers, even though the customers had not paid the increased rate. We affirmed, stating:

> To adopt Texas Eastern's position that it is, *ipso facto*, entitled to the refunds by virtue of having paid and absorbed them would be to countenance rate making by the producer-suppliers and Texas Eastern outside the protective ambit of § 4(e). This approach would do violence to the statutory scheme by avoiding, to the extent that the refunds exceed a fair return to Texas Eastern, any rate regulation whatever except under § 5 of the Act. 15 U.S.C.A. § 717d.

414 F.2d at 348.

The present situation differs in two important respects. First, the refund and

---

**4.** Apparently the first of the rate settlement agreements precluded Columbia from making a § 4 rate-increase filing to pass through Ozark's charges.

pass-through order to which Columbia objects today was not entered pursuant to § 4(e). Instead, the order here purports to derive its authority from § 16. The difference is not merely semantic or numeric. In contrast to the refunds ordered in *Texas Eastern,* the settlement payments the Commission ordered Ozark to make "are not traceable to specific rates, but rather are refunds intended to settle allegations that Ozark violated the NGA" by passing the extra costs of its unauthorized compression facilities to its customers such as Columbia. 43 FERC at 61,379. The Commission further stated: "A remedy imposed for a violation of the NGA is not equivalent to a refund resulting from a litigated case or from a rate settlement." *Id.* The Commission's order does not confront the danger of producer-supplier rate-making present in *Texas Eastern,* nor does it involve the retrospective adjustment of rates.

Second, the Commission concluded that if Texas Eastern were allowed to keep the refund from its supplier, Texas Eastern would earn "more than a reasonable rate of return" on the gas sold through its pipeline during the period of the supplier's overcharge. No such showing has been made with respect to Columbia's rate of return during Ozark's overcharge.

▪ The Commission contends that Columbia should not be allowed to retain the Ozark refund because Columbia owns a partnership interest in Ozark. In the Commission's words quoted above, the flow-through order was designed to preclude unauthorized profits to the Ozark partners *"at the expense of the customers."* This analysis cannot apply to the period when Columbia did not increase the price it charged its customers for gas. Furthermore, during this period Columbia obtained no profit from Ozark's violation of the NGA. The improper increases in cost were paid by Columbia, not passed along to Columbia's customers. Columbia's income per unit of gas sold did not vary. Columbia is entitled to keep the Ozark refunds paid to it for the period of March 1, 1982 to December 1982.

### Rate Settlement Agreements Do Not Preclude FERC's Ordering Pass Through to Consumers

This brings us to the brink of Columbia's main contention regarding the remainder of the refund amount: that the three identified rate settlements preclude the Commission's ordering a flow-through to consumers of the funds received from Ozark's § 16 settlement.

At the risk of unintended, unforseen inaccuracies, Columbia's theory runs like this if we correctly discern it. A rate settlement is, as the very name implies, a compromise among competing interests—the regulator (FERC), producer-suppliers, transporters, pipeline-sellers, distributors and ultimate users (end users), burner-tip consumers, and the like. In the negotiating process there is give and take, more accurately, give *up* and take *from.* In the intricacies of rate-making (and rate-compromising) all must anticipate that situations will arise in which provision must be made to cover the eventualities of actual practice which might bring about rates or charges that all negotiators would agree would be excessive. The settlement structure, therefore, must make provision for refunds. Here Columbia's theory reaches its dominant theme: making provisions for specific refunds can only mean that all other (non-specified) refunds are forbidden. Again, at the risk of oversimplification, it is to say that the settlement agreement is to be interpreted by what is *not said.*

This is risky business and risky contract interpretation law as the Sixth Circuit has made clear in *Texas Gas Transmission Corp. v. FPC,* 441 F.2d 1392, 1396 (6th Cir.1971):

In contract law, silence is not generally taken as indicating an agreement between the parties unless the contract, taken as a whole, is an attempt to govern all relationships between them, or all relationships concerning an ascertainable subject matter. There is no indication that the contract here was so intended.... [I]t [the contract] did not cover refunds of the type here in question.

Under these circumstances, the agreement's silence on the disposition of such refunds is not to be interpreted as an indication that the Commission waived all rights to require such refunds under its general policy of doing so.

The Court then went on to follow and expressly approve the position taken by this Court in *Texas Eastern Transmission Corp. v. FPC*, 414 F.2d 344, 349 (5th Cir. 1969).

Columbia fares no better in the consideration of each of the separate rate settlement agreements.[5]

■ As to the first of these, Columbia contends that its rate settlement[6] prevents the Commission from ordering Columbia to make "refunds," for the period during which that settlement was in effect since that settlement only requires Columbia to flow-through "refunds" in certain limited circumstances. We agree with FERC that the provisions on which Columbia relies, requiring Columbia to make certain refunds which are not referred to, cannot reasonably be construed as having the very different effect of authorizing Columbia to capture the § 16 payments involved here which arose from entirely unrelated § 16 enforcement proceedings initiated almost six years later. Additionally, this involves Columbia's "silence is golden" concept which we, as did the Sixth Circuit, *supra*, reject.

Next, Columbia stresses a provision in the § 4 settlement of October 1983.[7] We agree with the Commission that this provision which simply specifies that Columbia may collect "such rates" authorized by the settlement under § 4 "without refund obligation" is clearly designed only to signify the rates in the underlying § 4 proceeding (which were filed and made "subject to refund" until the proper rate level was resolved) have in fact been resolved and are therefore no longer "subject to refund". To put it another way, the provision reflects that the settlement has the same effect as a resolution of the § 4 proceeding on the merits. Even more decisive is that, as was the case of the 1982 settlement, *supra*, there is no possible suggestion that this provision authorizes Columbia to capture as yet unauthorized § 16 payments in enforcement proceedings that were not even under way.

Third, Columbia strenuously urges the June 1984 settlement.[8] On the surface there is a little more to this than the two preceding contentions because, unlike them, this settlement agreement authorizes Columbia to retain rate-related refunds arising from earlier periods outside the confines of the particular § 4 rate proceedings out of which the settlement arose.[9] In addition, as the Commission explained in the case before us, the Ozark settlement payments were made in the § 16 proceeding and "are not traceable to specific rates,

---

5. The Commission supplied to the Court the records in each of the three rate settlement agreements. The Court requested and obtained from the solicitor of FERC a supplemental brief, specifically addressing each of the respective rate settlement agreements as bearing on inclusion of flow-through of sums received from Ozark in the § 16 settlement.

6. Approved by the Commission July 22, 1982, in *Columbia Gulf Transmission Co.*, 20 FERC ¶ 61,072 (1982).

7. Approved by the Commission October 21, 1983, in *Columbia Gas Transmission Corp.*, 26 FERC ¶ 61,034 (1984). Columbia emphasizes Article 1, Rate Levels, which specifies Columbia's rates "are inclusive of the Gas Research Institute (GRI) R & D funding unit ... and the PGA surcharge and special surcharges.... Except as may be required by the ultimate resolution [as specified], the parties agree that Columbia and Columbia Gulf shall collect such rates

*without refund obligation,* as adjusted from time to time to reflect Commission approved tracking filings."

8. Approved by the Commission June 14, 1985, in *Columbia Gas Transmission Corp.*, 31 FERC ¶ 61,307 (1985). This specifically authorizes Columbia to retain all "commodity refunds" which are "applicable to the periods prior to April 1, 1985." Columbia thus urges that this settlement standing alone authorizes it to retain at least all the § 16 payments leading to the period prior to April 1, 1985.

9. P. 9 of the settlement refers to refunds arising from *Interstate Natural Gas Association v. FERC*, 756 F.2d 166 (D.C.Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 115 (1985), which was pending the time the parties entered into the settlement.

but rather are refunds intended to settle allegations that Ozark violated the NGA."

■ Additionally, and not to be forgotten, is that Columbia is directly affiliated with one of the four Ozark partners. *See,* n. 1, *supra.* It was Ozark who engaged in the illegal activities, giving rise to the § 16 agreed payments. Quite without regard to niceties of corporate law, structure and legal responsibility, the enterprises comprising the Columbia and Tennessee affiliates would each be the beneficiary of 50% of the $4.5 million payments which Ozark agreed to pay in the § 16 proceedings. In this situation, to allow Columbia to retain the refunds other than those earmarked for March to December 1982 would be to reward the Columbia system (and Tennessee) for the illegal actions of its affiliate.

*FERC Wholeheartedly Holds the Theory, Advisability and Inviolatability of Rate Settlement Agreements Which Preclude Flow–Through of Refunds*

Contrary to the suggestion in Columbia's brief that the Commission in *Columbia Gas Transmission Corp.,* 43 FERC ¶ 61,435 (1988); 45 FERC ¶ 61,047 (1988), is engaged in inconsistent decisions, this case is the best proof that the Commission regards rate settlements as very essential and that it will preclude flow-through of refunds if that is the real meaning of the settlement contract, properly construed. There the Commission rejected the consumer interests' argument that allowing Columbia to retain the refunds would be inequitable or that retention was required so that consumers would receive the protection intended.

> These arguments are irrelevant. As Columbia correctly observes, its settlement involved mutual compromises and was approved by the Commission as reasonable and in the public interest. There is no basis whatsoever to disregard the specific terms of the settlement.

*Columbia Gas Transmission Corp. & Chevron U.S.A., Inc.,* Nos. TA82–1–21–001 and CI64–26–023, Order Authorizing Retention of Funds at 5.

In denying the consumer's subsequent motion for rehearing, the Commission again responded to the consumer's reiterated assertion that the Commission had ignored the public interest in its Order. The following is its tribute to the desirability, the necessity and the inviolability of rate settlement agreements:

> The Commission considered the public interest in approving the Columbia settlement. The settlement provided that Columbia's customers would receive a rate reduction and a moratorium worth approximately $628 million over a two year period, as well as transportation and daily settlement concessions.... The Commission concluded that Columbia's settlement was fair and reasonable and in the public interest. It is also in the public interest to carry out the terms of a binding agreement—the Columbia settlement. The Commission cannot upset the integrity of a settlement merely because a provision operates more favorably for one party than another.

*Columbia Gas Transmission Corp. & Chevron U.S.A., Inc.,* Nos. TA82–1–21–027 and CI64–26–028, Order Denying Rehearing at 3 (Oct. 7, 1985).

On the appeal to the Third Circuit which affirmed the Commission's decision, *Washington Urban League v. FERC,* 886 F.2d 1381 (3d Cir.1989), the Court disposed of the attack made by consumer interest to the legal sanctity of the rate settlement agreement in this way: "The principal argument of [consumer interests] is that even if the Columbia settlement agreement is properly construed to authorize retention of the Gulf refunds by Columbia, the Commission acted arbitrarily, capriciously, and indeed unconstitutionally in failing to override that agreement with an Order requiring a flow-through by Columbia." 886 F.2d at 1388. The Court then concluded:

> This brings us to the fundamental fairness argument. The Commission recognized that the ultimate consumers had suffered injury as a result of Gulf's default and that they well might be entitled to a share of the refunds were it not for the Columbia settlement agreement. The fact remained, however, that there

was a settlement agreement, one that gave to Columbia's customers a rate reduction and moratorium valued at $628 million, a setoff against possible future recovery by Columbia of unrecovered gas costs, and other concessions.

886 F.2d at 1390.

The *Washington Urban League* case, contrary to being inconsistent, reflects the Commission's policy that when the rate settlement agreements, properly construed, provide for preclusion of flow-through of refunds, that agreement will be fully upheld.[10]

For these reasons the Commission acted properly and consistently in requiring flow-through of the Ozark and the settlement payments, except for the period from March 1, 1982 to December 1982.

ORDER ENFORCED AS MODIFIED.

**10.** We approve the solicitor's analysis of that case as highly persuasive. Moreover, that case is clearly distinguishable from the one before us. Unlike the situation we are faced with, all parties in that case were cognizant of the existence of these refunds when they entered into the settlement. In addition, the refunds in that case had arisen as a result of Gulf Oil's breach of its contractual obligation to deliver gas. In construing Article II of the 1985 Settlement, the Commission pointed out that "the Gulf refund monies represented *overpayment of purchased gas costs* that [Gulf's customers] had to pay for replacement gas because of Gulf's breach [and that since] these purchase gas costs [were allocated] to the commodity component of rates charged to ... customers such as Columbia ... Gulf's refunds *are commodity refunds* ... applicable to the period covered by Columbia settlement ... that Columbia is entitled to keep." *Columbia Gas Transmission Corp.,* 45 FERC ¶ 61,047 at ¶ 61,164 (1988) (emphasis added). Finally, a critical factor in that case, unlike here, is that Columbia was itself a victim of the wrongdoing of its upstream supplier, Gulf.